# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CHRISTINA D. LIMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  09-3087 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

Plaintiff Christina E. Lima appeals the denial of her application for disability insurance benefits and supplemental security income under the Social Security Act.  42 U.S.C. §§ 405(g) & 1383(c)(3).  The parties have filed cross motions for summary judgment.  For the reasons set forth below, the Defendant Commissioner's Motion for Summary Affirmance (d/e 9) is ALLOWED, and Plaintiff Lima's Motion for Summary Judgment (d/e 5) is DENIED.  The Decision of the Commissioner is affirmed.

## STATEMENT OF FACTS

Lima was born on February 9, 1968.  She is a registered nurse with a

bachelor's degree in nursing.  She lives in Springfield, Illinois, with her parents.  She has experience working in a variety of jobs in the healthcare industry, including as a nurse and a hospital clerk receptionist.  In 2004, Lima was working as a registered nurse in a birthing center.  In April 2004, Lima went to the emergency room complaining of fibromyalgia pain. Answer (d/e 3), attached Certified Transcript of Proceedings (R.), at 284. The examination of her at the time showed full range of motion, normal muscle strength and tone.  R. 284.  The emergency physician gave her pain medication intravenously and by mouth, and discharged her.  R. 284.

On August 4, 2004, Lima went to see her primary care physician, Nicole Florence, M.D., with complaints of gastrointestinal pain and stress. Dr. Florence diagnosed Lima with abdominal pain, fibromyalgia, and depression.  She referred Lima for a gastrointestinal evaluation.  R. 242.

In September 2004, Lima started being treated by psychiatrist Patrick O'Donnell, M.D.  Dr. O'Donnell initially diagnosed Lima with general anxiety disorder and nicotine dependence.  He assessed a Global Assessment of Functioning (GAF) score of 53.  He prescribed medication at that time. R. 234.

On November 24, 2004, Lima spoke with Dr. O'Donnell.  His notes

indicate that she was having problems at work due to excessive absences. She reported that she "broke down" at work.  She also reported taking some college classes and having some problems with those classes.  Dr. O'Donnell modified her medications at that time.  R. 226.

On or about December 15, 2004, Lima stopped working.   On December 15, 2004, Lima spoke to Dr. O'Donnell about her decision to stop working.  According to Dr. O'Donnell's notes, Lima stated that she felt she had to resign because people were falsely accusing her of failing to do her job properly.  R. 324.

On December 16, 2004, she spoke to Dr. O'Donnell again.  She told him that her medication was helping her cope.  She also mentioned emailing a man she met online through Yahoo! Personals, and her love of Spanish. She also stated that she was taking some college courses.  She received an "A" grade in one course and an incomplete in another course.  R. 323.

On December 20, 2004, Lima saw Dr. Florence for pain.  Lima reported a fibromyalgia flare-up over the last three days.  On examination, Dr. Florence observed trigger point pain.  She also noted that Lima was anxious.  R. 240-41.

Lima spoke to Dr. O'Donnell on January 10 and 14, 2005.  Lima told

Dr. O'Donnell that her fibromyalgia was getting worse and that she received a prescription for Darvocet.  Lima reported that she was not sleeping well.  Lima also told Dr. O'Donnell that she was taking courses toward certification for medical coding.  She was taking at least one of the classes online and so could do the work at home.  R. 322

On January 28, 2005, Lima saw gastroenterologist William Peterson, M.D., on the referral from Dr. Florence.  Dr. Peterson diagnosed probable irritable bowel syndrome.  R. 258.  He set up tests for her gastrointestinal system, but Lima canceled the tests due to insurance problems.  R. 256.

Sometime in January 2005, Lima went on a trip to Disney World.  On February 25, 2005, Lima told Dr. O'Donnell that she received a Toradol shot and Darvocet while she was at the hotel at Disney.  R. 319.  She reported starting a new job at the local community college computer flex center.  She said she would be paid minimum wage, but the hours were flexible and she could do homework on the job.  She also told Dr. O'Donnell that she was going to meet a guy she communicated with online, but "got cold feet."  R. 318.

On March 15, 2005, Lima told Dr. O'Donnell that she experienced the worst flare-up of her life.  She also reported having problems sleeping

and that she was frequently sleepy during the day.  R. 318-19.  Lima stated that she liked her job.  She reported having two dates with a man from Lincoln, Illinois.  R. 317.

On April 8, 2005, Lima saw Dr. Florence.  On examination, Lima reported pain on palpitation of her thighs and arms.  Dr. Florence gave her an injection for the pain.  R. 297.  Dr. Florence diagnosed fibromyalgia with moderate severity.  Dr. Florence recommended a rheumatologist.  R. 297.

On April 11, 2005, Lima reported to Dr. O'Donnell that she was, "flaring a lot more." R. 316.  She reported that Dr. Florence (referred to as Dr. Nikki) gave her an injection for the pain.  R. 316.  She said that she missed a bit of work because of the fibromyalgia flare-up, pollen, allergies and colds.  Her energy was normal, and her concentration was a little better. She said that a guy in St. Louis was "bugging" her.  She, "concluded [that the ] guy had too many emotional issues."  R. 316.

On April 21, 2005, Russell Taylor, Ph.D., reviewed Lima's medical records and performed a mental residual functional capacity assessment.  R. 338-55.  Dr. Taylor opined that Lima's mental impairments caused moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning; mild difficulties in maintaining

concentration, persistence or pace; and one or two episodes of decompensation. R. 352. Dr. Taylor also opined that Lima was moderately limited in her ability to maintain attention and concentration for extended periods, and moderately limited in her ability to accept instruction and respond appropriately to criticism from supervisors. R. 338-39.

Dr. Taylor noted that Lima "alleges fibromyalgia, bipolar disorder, ADHD and depression." R. 340. Dr. Taylor noted that Dr. O'Donnell's initial diagnosis was generalized anxiety disorder. Further, Dr. Taylor noted that Dr. O'Donnell's "Mini-Mental Status Exam revealed no cognitive deficits and Intelligence was estimated as average or better. The genesis and rationale for ADHD and Bipolar Dx is not clear." R. 340.

Dr. Taylor noted that Lima was "[a]ble to clean, do laundry, shop, drive, date, run errands, read often, conduct her own finances and assist students in a computer lab. The [clamant] describes her energy as limited and she reports having difficulty with concentration and memory." R. 340. Dr. Taylor opined that Lima's reduced energy levels from her physical impairments could cause moderate limitations in exerting mental control over extended periods of time. R. 340. Dr. Taylor opined that Lima could understand, remember, and execute both simple and complex instructions,

and that her adaptive functioning remained intact.  R. 340.  Dr. Taylor opined that Lima had the capacity to perform substantial gainful activity. R. 340.

On April 22, 2005, state agency evaluator Paul Smalley, M.D., reviewed Lima's medical records and performed a physical residual functional capacity assessment.  Dr. Smalley noted that Lima could walk unassisted and could pick up and manipulate objects.  R. 337.  Dr. Smalley opined that Lima could lift and carry 50 pounds occasionally and 25 pounds frequently; and could sit, stand, and walk for six hours in an eight-hour work day.  R. 331.

On June 7, 2005, Lima went to see Dr. Florence.  Dr. Florence gave Lima an injection for her pain.  R. 294.  On June 13, 2005, Lima went to see Dr. O'Donnell again.  R. 312.  She reported that she just returned from a trip to Louisiana.  She said that she convinced a friend to join her on a trip to a family vacation spot in Minnesota.  R. 312.  She also reported that she may get an expense-paid trip to Montana to speak.  R. 312.  She told Dr. O'Donnell that she may get a part-time job monitoring a chat room.  She said she was getting into a web-based marketing business, but she was hiding the business from her parents.  R. 312.

On June 29, 2005, Dr. O'Donnell completed a questionnaire concerning Lima's mental status. R. 357-60. He diagnosed her with Bipolar Disorder not otherwise specified, AD/HD not otherwise specified, General Anxiety and Social Anxiety Disorders. He said she had a Global Assessment of Functioning (GAF) score of 63. He noted that she showed improvements in sleep, concentration, energy, anxiety, insight, and mood stability. He also stated that her medications may cause drowsiness and impair short-term memory. Dr. O'Donnell stated that her speech was mildly fast with mild pressure; she was mildly restless; her thoughts were often tangential; other times she would perseverate on one topic. She scored poorly on a short term memory test. Her prognosis was fair. He stated that she may improve with medication and better control of her fibromyalgia. Dr. O'Donnell opined that Lima's limitations resulted in: moderate restrictions of activities of daily living; marked difficulties in maintaining social functioning; moderate deficiencies of concentration, persistence or pace; and one or two episodes of decompensation within the last twelve-month period, each of at least two weeks in duration. R. 357-60.

Dr. O'Donnell stated that Lima had a medically documented history of a chronic mental disorder of at least two years' duration that had caused

more than minimal limitation on her ability to do basic work, and a history of one or more years' inability to function outside a highly supportive living arrangement with a continued need for such an arrangement.  R. 360.  He further opined that her impairments would cause her to be absent from work about three days per month.  R. 360.

Lima continued to see Dr. O'Donnell regularly in 2006.  During that year, she reported on several occasions that she felt exhausted and had difficulty sleeping.  E.g., R. 385-416.  Lima also sometimes reported an inability to focus.  E.g., R. 392, 401.  On February 6, 2006, however, Lima told Dr. O'Donnell that she was constantly talking to people.  She stated that she was going to Florida for Mary Kay followed by a trip to Minnesota.  She stated that she had recently attended a seminar in St. Louis.  R. 418.  On March 9, 2006, Lima reported getting five recruits.  She said that she was a future sales director.  She said that she would get a car with $10,000.00 more in production.  R. 417.  She reported earning an $800 commission check from Mary Kay.  R. 416.

On April 19, 2006, Lima told Dr. O'Donnell about her Mary Kay activities.  She told Dr. O'Donnell that the work was piling up.  She said that she was close to getting twelve team members.  R. 414.  She also told

Dr. O'Donnell that she fell out of bed and hurt her clavicle.  She also reported difficulty sleeping and increased forgetfulness.  R. 414.

On May 26, 2006, Lima and her parents met with Dr. O'Donnell.  His notes described the meeting as a crisis session.  Dr. O'Donnell stated that Lima was mildly sad to angry and moderately anxious.  Lima's parents stated that Plaintiff had spent $50,000.00 since January 2005.  In addition, she still owed $30,000.00 as a result of a divorce in 2003.  R. 411.  Dr. O'Donnell's notes from May 30, 2006, indicated that she owed other debts also.  R. 410-09.

On July 10, 2006, Lima told Dr. O'Donnell that she felt tired and drained.  She also stated that she attended a party with her "director" where she received awards.  She told Dr. O'Donnell that she was going to Dallas from July 16 to 19, 2006, and then to Minnesota from July 21 to August 5, 2006.  R. 405.

On August 8, 2006, Lima saw Dr. O'Donnell again.  She told him that she fell out of the bed in the hotel in Dallas during her trip.  She said she went to the hospital in Dallas because she was suffering from heat exhaustion.  R. 404.  She said that during her trip to Minnesota, she sat around a campfire drinking with a man named Rick.  R. 404.  After seeing

Dr. O'Donnell, Lima went to the emergency room the same day.  She told the emergency room doctor that she had a CT scan in Dallas after she fell out of the bed.  She reported that the scan was normal.  R. 688.  She also reported, that at some point during her trip, she slipped on a wet rock and fell.  She believed that she broke her tail bone.  R. 689.  Emergency room tests for fractures were negative.  R. 683-86, 689.

On February 15, 2007, Dr. Florence completed a pre-operative history and physical of Lima.  Lima was undergoing surgery for a broken clavicle. R. 439.  She broke her clavicle in an automobile accident several months earlier.  R. 639-41, 786-87.  In the Functional Status section of the pre-operative physical form, Dr. Florence underlined the Intermediate rating. R. 440.  The Intermediate rating stated: "Climb 1 flight of steps, walk up a hill, short run, walk a mile in 15 minutes."  R. 440.  She underwent surgery on February 16, 2007.  R. 639-41.  Follow-up tests showed the clavicle to be well-aligned.  R. 633.

On April 20, 2007, Lima saw Dr. Florence's partner Cara Vasconcelles, M.D.  R. 437.  Lima complained of fibromyalgia pain and pain from the surgery.  Dr. Vasconcelles indicated that Lima had a history of narcotics addiction, and that she received narcotics after the surgery.  R. 437.  Dr.

Vasconcelles called Dr. O'Donnell.  Dr. Vasconcelles told O'Donnell that Dr. Florence had Lima on zero narcotics due to the past abuse.  R. 376.  Dr. Vasconcelles was concerned that Lima was suffering from withdrawal symptoms from the pain killers she received after the surgery.  R. 376.  Dr. Vasconcelles recommended that she go to the emergency room for a psychiatric evaluation, but Lima refused to go to the emergency room.  R. 376, 437.  Dr. Vasconcelles discharged her for leaving against medical advice.  R. 437-38.  Later that day, however, Lima went to the emergency room complaining of migraine headaches.  She received phenergan and dilaudid for the pain.  R. 634-35.  Shortly after this incident, Dr. Florence told Lima that she would no longer treat Lima because Lima had not followed prescribed treatment.  R. 375, 436.  Dr. Florence, however, continued to treat Lima.

On May 7, 2007, Lima saw Dr. O'Donnell again.  She told him that she was going to seminars in Minneapolis and Chicago.  On May 29, 2007, Lima returned to the emergency room complaining of migraine headaches. She again received phenergan and dilaudid and was released.  R. 602-03.

On June 2007, Lima went to the emergency room complaining of migraine headaches.  R. 575.  During one visit, she reported that her

primary care physician had sent her for admission, but the emergency room physician noted that this was not true.  She received toradol and phenergan and was released.  R. 575.

On July 3, 2007, Lima saw Dr. O'Donnell again.  She stated that her mother had to get healthy for a trip to Chicago in two weeks, and then to a cabin in Minnesota.  Lima looked for a part-time job, but her mother told her that she would lose "I-CHIP".[1]  R. 364.  Lima stated that she preferred to get disability until her business took off.  She told Dr. O'Donnell that she was setting up a business on e-bay.  R. 364.

On July 9, 2007, Lima went to see a neurologist Claude Fortin, M.D., for her migraine headaches.  R. 727-29.  Dr. Fortin found no neurological or physical abnormalities.  R. 728.  Lima had normal muscle strength and was fully oriented with intact attention span and concentration.  R. 728.  In October and November 2007, Dr. Fortin examined her again after she lost her driving license.  He ordered an EEG and MRI.  The EEG showed mild epileptogenic potential, but the MRI was normal.  R. 713-14, 721, 724.  Dr. Fortin did not approve her for driving due to the sedating effect of her medications, as well as the inconclusive EEG.  R. 722.

---

[1]ICHIP stands for Illinois Comprehensive Health Insurance Plan.  R. 765.

On January 25, 2008, Dr. O'Donnell submitted another mental status assessment.   He diagnosed Lima with Attention Deficit/Hyperactivity Disorder-Inattentive Type; Bipolar II Disorder; Generalized Anxiety Disorder; Nicotine Dependence.  He stated that she had severe problems with her support groups, finances, and transportation.  He opined that she had a current GAF score of 43, with the highest GAF score of 47 within the last twelve months.  R. 739.  He stated that he doubted whether she could consistently follow supervisor's directions or policies.  R. 739.

The Administrative Law Judge (ALJ) conducted an evidentiary hearing on January 17, 2008.  Lima, her mother Rebecca Wilkin, and vocational expert Bob Hammond testified at the hearing.  Lima's counsel was present at the hearing.  Lima testified that she lived with her parents.  She did not drive.  R. 763.  She saw Dr. O'Donnell every two weeks.  R. 770.  She testified that she tried starting ventures on the Internet, but her mental problems prevented her from following through on tasks.  R. 767-69.  She stated that she left her nursing job in December 2004, after missing too much work due to her fibromyalgia and problems with concentration.  R. 772.  She said that she left rather than be fired.  She said that her superiors were concerned that she would become easily distracted and might make

14

mistakes.  R. 783-84.

Lima testified that she usually resigned from jobs after she got sick for a few weeks.  Lima testified that she would get a fibromyalgia flare-up.  She testified that she would lie on the couch unable to go anywhere, except to the emergency room if the pain became too severe.  R. 773-74.  She also testified that she suffered from insomnia.  She said that the insomnia was a symptom of fibromyalgia.  R. 775.

Lima testified that she took a course to become a medical coding specialist.  The school hired her while she was taking the courses.  She was paid minimum wage.  She could set her own hours and work up to nineteen hours per week.  She said that her performance declined after the first day. She said that she was unable to sit for the periods necessary to perform the job.  R. 776-77.

Lima testified about her daily activities.  She said that she used to be on the computer all day long, but for the last couple of weeks she used the computer for only about fifteen minutes a day.  She spent most of her other time in bed watching television.  She did not do housework, yard work, or other chores around the house.  R. 777.  She said that physical labor caused a flare up of her fibromyalgia.  R. 778.  She said that she stayed in her

pajamas if she did not need to go anywhere.  She said she had gone months without bathing.  R. 790.  She testified that her mother washed her laundry. R. 790.  Lima testified that she could not lift more than five pounds without experiencing pain.  R. 788.

Rebecca Wilkin, Lima's mother, then testified.  She testified that Lima lived with her and her husband for about fifteen years on and off since high school.  R. 792.  Wilkin testified that Lima got confused easily and that Lima's other symptoms had gotten worse over time.  She said that Lima took several days off at a time when she worked at her last nursing job.  R. 793.  Wilkin testified that at the time of the hearing, Lima stayed in bed all day and was awake all night.  R. 793.  Wilkin did not ask Lima to do chores because she was unreliable and because the work would cause Lima's fibromyalgia pain to flare up.  R. 794.

Vocational expert Hammond then testified.  The ALJ asked Hammond the following question:

> I'm going to ask you if you would to assume a hypothetical person of the age of 39 years, with a B.S. degree in nursing, with past relevant work the same as the Claimant's.  I'll ask you to assume that this person would be capable of doing exertional level work at the light level with the following exceptions.  I want jobs -- I want you to see if you can identify jobs where the person would never be required to do any climbing of ladders or

scaffold -- you know, scaffolding, unprotected heights.  Let's go with brief instead of occasional on most of the postural limitations so that we don't cause a flare-up of fibromyalgia, and let's look at -- let's look at first jobs with a -- well first we'll go -- we're going to be looking at jobs with an SVP of probably 4 or less.  I think the higher level jobs are going to be more than she can handle with her concentration problems.  So let's look at those to begin with and see where we are.  Are there other -- are there jobs that she's done in the past that you believe she could still do with those limitations?

R. 798-99.[2]  Hammond responded, "Based upon the hypothetical, Your Honor, the only position that would be left would be the hospital clerk position."  R. 799.  Hammond also opined that the person in the hypothetical question could perform other jobs such as other clerical positions in a hospital (47,600 positions in Illinois), telephone operator (9,200 positions), telephone solicitor (16,230 positions), order clerk (7,000 positions), and pharmaceutical technician (17,200 positions).  R. 800-01.  Hammond also opined that the person could not maintain employment if she missed work three to four times per months.  R. 801.

The ALJ issued her Decision on March 11, 2008.  R. 23-32.  The ALJ

---

[2]SVP stands for "Specific Vocational Preparation."  United States Department of Labor, Dictionary of Occupational Titles (1991), Appendix C, found at http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM, visited on February 8, 2010.  A job with an SVP Level 4 requires over 3 months and up to 6 months of specific vocational preparation.  Id.

followed the five step analysis set forth in Social Security Administration regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of the claimant's age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  The Listings of such severe impairments are set forth in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  The claimant's condition must meet the criteria in a Listing or be equal to the criteria in a Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the claimant not to be able to return to her prior work considering her Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step;

the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995); Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995).

The ALJ found that Lima met her burden at Steps 1 and 2.  The ALJ found that Lima was not engaged in substantial gainful employment and that she suffered from severe impairments due to fibromyalgia, migraine headaches, bipolar disorder, and anxiety.  R. 25.

At Step 3 of the Analysis, the ALJ determined that Lima's impairments were not severe enough to be equivalent to any Listing.  R. 26. The ALJ stated that the relevant Listing for fibromyalgia required a level of impairment that resulted in a severe loss of function, such as an inability to ambulate or an inability to perform fine and gross movements effectively. R. 26.  Lima's impairment from fibromyalgia did not reach that level.  The ALJ stated that the migraines were not equivalent to a Listing because the migraines did not cause Lima to need a highly supportive living arrangement and did not cause repeated episodes of decompensation.  R. 26.

The ALJ found that Lima's bipolar disorder and anxiety did not meet a Listing.  The relevant Listing required meeting one of two tests.  Lima

needed to: (1) have two of the following: (a) marked limitations in activities of daily living, (b) marked limitations in maintaining social functioning, (c) marked limitations in maintaining concentration, persistence or pace, and (d) repeated episodes of decompensation, each of an extended duration; or (2) (a) have repeated episodes of decompensation; or (b) have a history of an inability of being able to function outside of a highly supportive living environment Listing 12.04 (B) & (C).  The ALJ found that Lima had only mild to moderate limitations on her activities of daily living.  The ALJ noted that Lima was able "to leave home to go out into the community, able to work a part time job, and even travel to distant cities for vacation and educational conferences."  R. 26 (citations to the record omitted).  The ALJ found that Lima had only mild limitations on her ability to maintain social functioning, "Based on her very active lifestyle she has frequent contact with others and it does not seem to cause her to experience more than mild problems."  R. 26.  The ALJ found that Lima had mild to moderate limitations in maintaining concentration, persistence or pace. "The claimant consistently reports that she has trouble concentrating and staying on task; however, the fact that she has been able to successfully engage in such a busy schedule of activities suggests that her difficulties are less than

20

marked." R. 26.  The ALJ also found that Lima had only one or two episodes of decompensation. R. 27.  The ALJ also found that Lima did not meet the alternate requirements for the Listing because she could function outside of a highly supportive living environment and did not have repeated episodes of decompensation. R. 27.

At Step 4, the ALJ determined that Lima had the RFC to perform light work except that she was unable to climb ladders, ropes, and scaffolds, and should avoid concentrated exposure to unprotected heights. R. 27.  The ALJ relied on Lima's activities to reach this finding, including her ability to attend classes, engage in part-time work, and travel extensively. The ALJ also relied on the opinions of Drs. Smalley and Taylor.  The ALJ found that Lima's testimony regarding the severity of her symptoms lacked credibility. The ALJ noted that the medical records indicated that her symptoms were controlled with medications. R. 27-29.

The ALJ did not give Dr. O'Donnell's opinions controlling weight because she found them to be inconsistent with his own notes and with Lima's level of activity:

> A review of his treatment notes indicates that the claimant has typically responded well to the medication he prescribed, and objectively he consistently observed her to be well groomed,

21

fully oriented to person, place, and time, and having a mildly bright affect.  In contrast to his treatment notes, his reports suggest that she is totally disabled.  Although Dr. O'Donnell is well qualified and has a long treatment relationship with the claimant, his reports that indicate total disability are not consistent with the objective observations he has reported in his treatment notes, and for that reason they can not be given significant weight.  In addition, his opinion that she is totally disabled is contrary to her active lifestyle.

R. 29 (citations to the record omitted).  The ALJ concluded, "The undersigned is persuaded that a highly educated person with relatively mild symptoms of anxiety and depression would be capable of performing light and sedentary semi-skilled work consistent with the above RFC."  R. 29.

Based on the RFC, the ALJ found at Step 4 that Lima could perform her past relevant work as a hospital clerk-receptionist.  R. 30.  The ALJ also found that the Commissioner met his burden at Step 5 to show that Lima could perform jobs that existed in significant numbers in the national economy.  The ALJ relied on Hammond's testimony to make these findings. R. 30-31.  The ALJ, therefore, concluded that Lima was not disabled.

Lima appealed the Decision to the Commissioner's Appeals Council. The Appeals Council denied her request for review on February 10, 2009. Lima then filed this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the ALJ's Decision to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  This Court must accept the ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ.  <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ further must articulate at least minimally her analysis of all relevant evidence.  <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence.  <u>Diaz v. Chater</u>, 55 F.3d 300, 308 (7th Cir. 1995).

In this case, the ALJ's Decision is supported by substantial evidence. The evidence in the medical records regarding Lima's level of activity and social interaction, combined with the opinions of Drs. Smalley and Taylor, support the ALJ's determination that Lima's condition did not meet any Listing and the ALJ's determination of Lima's RFC.  The testimony of Vocational Expert Hammond supported the ALJ's determination at Step 4 that Lima could perform her prior work as a hospital clerk-receptionist, and

the ALJ's determination at Step 5 that Lima could perform a significant number of other jobs in the national economy.

Lima argues that the ALJ erred because she did not give Dr. O'Donnell's opinion controlling weight. A treating physician's medical opinion is entitled to controlling weight when it is well supported by medically acceptable clinical and diagnostic techniques and is reasonably consistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. In this case, the ALJ correctly noted that Dr. O'Donnell's opinions were inconsistent with some of his own notes regarding her appearance and behavior. Dr. O'Donnell's opinions regarding the limitations on Lima's daily activities and maintaining social functioning were also inconsistent with her behavior. Lima took college courses, held a part-time job, traveled to Minnesota on at least four separate occasions, and also traveled to Disney World, St. Louis, Chicago, Dallas, Louisiana, and again to Florida. She also may have also made a trip to Montana. Her ability to take college courses and to travel extensively indicate that Lima has few limitations on her daily activities and her ability to maintain social functioning. Her level of activities, particularly her extensive travels, also provided substantial evidence that she could function outside of a highly

supportive environment.  Dr. O'Donnell's opinions were also inconsistent with Dr. Taylor's opinions.  Given the conflicting substantial evidence in the record, the ALJ was not required to give Dr. O'Donnell's opinion controlling weight.

Lima also argues that the ALJ failed to give Dr. Florence's opinions controlling weight.   Lima, however, does not cite any opinions by Dr. Florence regarding Lima's limitations due to her condition.   Generally, Dr. Florence's records consisted of a recitation of Lima's subjective reports of her condition, not opinions by Dr. Florence.   Dr. Florence opined that Lima's fibromyalgia was of moderate severity.  R. 297.  Dr. Florence also apparently opined on the 2007 preoperative physical form that Lima was at an intermediate fitness level.   Dr. Florence underlined the intermediate rating on the form.  R. 440.  These opinions were consistent with the ALJ's determination of Lima's RFC and the determination that she was not disabled.

Lima is correct that the ALJ made some statements in her Decision that were not supported by substantial evidence.  The ALJ stated that Lima testified that she could lift twenty pounds occasionally and ten pounds frequently.  R. 28.  Lima testified that she could only lift five pounds

without suffering significant pain.  R. 788.  The ALJ also stated that Lima

performed household chores.  R. 26, 28.  Lima and her mother both testified

that she did not perform any household chores.  R. 777, 794.  Even so,

other substantial evidence in the record supported the ALJ's Decision.  Dr.

Smalley's opinions supported the ALJ's determination of Lima's exertional

limitations.    The evidence of Lima's activities supported the ALJ's

conclusions that Lima had only mild to moderate limitations on her daily

activities, social functioning, and her ability to maintain concentration,

persistence, and pace.  Lima took college courses, worked a part-time job,

and took ten or more trips in two and one-half years.

Lima filed a reply brief in which she challenged the ALJ's credibility

determination.  Brief in Reply to Defendants [sic] Motion for Summary

Judgment (d/e 12), at 1-4.  The Court will not review the credibility

determinations of the ALJ unless the determinations lack any explanation

or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir.

2008).  Here, there was sufficient evidence to support the credibility

determinations.  For example, Lima testified that she lay on her bed in her

pajamas for months without bathing and without leaving the house was not

credible.  She did not lay around the house for months; she went to see Dr.

O'Donnell every two weeks, took numerous trips, took college courses, and worked a part-time job.  In another example, Lima falsely reported to emergency room personnel on one occasion that her personal physician sent her to the emergency room for admission.  These examples, among others, supported the ALJ's determination that she was not credible.

THEREFORE, the Defendant Commissioner's Motion for Summary Affirmance (d/e 9) is ALLOWED, and Plaintiff Lima's Motion for Summary Judgment (d/e 5) is DENIED.  The Decision of the Commissioner is affirmed.  All pending motions are denied as moot.  This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   February 17, 2010

FOR THE COURT:

_____ s/ Jeanne E. Scott _____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE